IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY LOU CAVENDER,<br><br>    Plaintiff,<br><br>  v.<br><br>SUTTER LAKESIDE HOSPITAL, INC.,<br><br>    Defendant | No. C-04-3110 MMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT; DISMISSING PLAINTIFF'S STATE LAW CLAIMS; VACATING HEARING.** |

    Before the Court is defendant Sutter Lakeside Hospital, Inc.'s motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and plaintiff Mary Lou Cavender's motion for partial judgment of liability, pursuant to Rule 56. Having reviewed the papers filed in support of and in opposition to the motions,[1] the Court deems the matters suitable for decision on the papers, VACATES the hearing scheduled for September 2, 2005, and rules as follows.

---

[1] Defendant, in support of its motion, filed a six-page Separate Statement of Undisputed Facts ("Statement"). Plaintiff requests that the Court strike the Statement on the ground the Local Rules of this District do not permit the filing of a Statement "[u]nless required by the assigned Judge." See Civil L.R. 56-2(a). Because defendant did not seek permission before filing its Statement, the filing was procedurally improper. Plaintiff, however, has not argued, let alone shown, she was prejudiced by the filing of the Statement. Moreover, the content of the Statement, with the exception of citations to evidence, is set forth verbatim at the beginning of defendant's 13-page memorandum of points and authorities. Finally, defendant's filing of the Statement did not result in defendant's exceeding the 25-page limit for written motions. See Civil L.R. 7-2(b). Under the circumstances, the Court declines to strike the Statement.

## BACKGROUND[2]

On July 30, 2003, at approximately 10:30 p.m., Roderick Cavender ("Roderick") took his mother, plaintiff Mary Lou Cavender, then 80 years of age, to defendant's emergency room ("ER"), because plaintiff had been slurring her speech during the day. (See Roderick Decl. ¶¶ 1, 2.)[3] Roderick is not plaintiff's legal guardian, nor does he hold a power of attorney. (See Roderick Dep. at 12:3-5.)[4] Later that evening, Roderick was informed that plaintiff had suffered a stroke, had extremely high blood pressure and needed to be hospitalized immediately. (See Roderick Decl. ¶ 2.) At 1:30 a.m. on July 31, 2003, plaintiff was admitted to defendant's medical/surgical ward for "observation and cerebral vascular accident work-up." (See Lovejoy Decl. ¶ 2.)

On July 31, 2003, plaintiff was given a chest x-ray, an ultrasound and other tests. (See id. ¶ 4.) That same day, plaintiff's physician, Kirk G. Andrus, M.D. ("Dr. Andrus"), examined plaintiff and formed the opinion that her stroke symptoms had "stabilized." (See Andrus Dep. at 28:20-23.)[5] In his notes, Dr. Andrus wrote that plaintiff "does not go to physicians and wants to go home to be with her grandson," (see Lovejoy Decl. Ex. A at 17th unnumbered page), and that he had "spent a great deal of time" talking to plaintiff about the need for her to stay in the hospital to receive treatment, (see id. Ex. A at 19th unnumbered page). At his deposition, Dr. Andrus was of the opinion that if plaintiff's condition had remained stable for 24 hours, and had she wanted to leave, she would have been discharged "within a day or two," provided that the results of a echocardiogram did not show anything "really urgent." (See Andrus Dep. at 34:20 - 35:6.)

Roderick visited with plaintiff most of the day of July 31. (See Roderick Decl. ¶ 3.)

---

[2] The following facts are undisputed.

[3] The declaration of Roderick Cavender is attached as Exhibit B to plaintiff's opposition to defendant's motion and as Exhibit B to plaintiff's motion.

[4] Excerpts from the deposition of Roderick Cavender are attached as Exhibit F to the Declaration of Alan L. Martini filed July 13, 2005.

[5] Excerpts from the deposition of Dr. Andrus are attached as Exhibit A to the Declaration of Alan L. Martini filed July 13, 2005.

When Roderick left the hospital at approximately 10:00 p.m. that evening, plaintiff was resting comfortably and was "hooked up" to medical monitoring devices. (See id.) At 11:00 p.m. that evening, defendant's nursing staff noted that plaintiff was in bed, but at 1:00 a.m. on August 1, observed that plaintiff was not in her room, and notified both plaintiff's physician and plaintiff's daughter that plaintiff had left the hospital. (See Lovejoy Decl. ¶ 4, Ex. A at 27th unnumbered page.) At approximately 1:15 a.m., Roderick was notified by his sister, plaintiff's daughter, that plaintiff was not at the hospital, after which Roderick contacted Robert Cavender ("Robert"), who is Roderick's father and plaintiff's ex-husband. (See Roderick Decl. ¶¶ 4-5.) Robert and Roderick then went to the hospital. (See id. ¶ 5.)

Meanwhile, at the hospital, Patricia Williams ("Williams"), a certified nursing assistant, went to look for plaintiff by car and, accompanied by another nursing assistant, found plaintiff in a "ditch across the street from the back of the hospital," where they waited until help arrived. (See Williams Dep. at 15:2-20.)[6] Plaintiff had dressed herself before leaving the hospital and was not wearing a hospital gown. (See Smith Dep. at 33:9-10.)[7] Two men arrived with an ambulance and they, along with Williams, helped plaintiff up from the ditch and set her down on a gurney. (See Williams Dep. at 21:2-23.) Plaintiff, however, refused to get into the ambulance. (See id. at 21:24.) At this point, Williams, in an effort to convince plaintiff to get into Williams' car, told plaintiff that if she got in, Williams would "try not to take her back there." (See id. at 22:1-8.) After plaintiff got into the car, Williams drove plaintiff back to the hospital and parked outside of the ER door. (See id. at 22:1-2, 22-23.) Plaintiff stated to Williams that she "didn't want to go back in there." (See id. at 25:15-21.) The ER staff, including nurse Tina Smith ("Smith"), then came out of the ER with a wheelchair; Smith helped plaintiff out of Williams' car and put plaintiff in the wheelchair. (See id. at 23:1-18.)

---

[6] Excerpts from the Williams deposition are attached as Exhibit B to the Declaration of Alan L. Martini filed July 13, 2005.

[7] Excerpts from the Smith deposition are attached as Exhibit E to the Declaration of Alan L. Martini filed July 13, 2005.

Smith, observing that plaintiff had a "hematoma" on her head, tried to encourage plaintiff to allow herself to be evaluated in the ER, but plaintiff refused. (See Smith Dep. at 29:9-13.) When Smith then stated, "just let me take you in and try to clean you up a little bit," plaintiff agreed and allowed Smith to take her into the building by wheelchair. (See id. at 37:2-5, 39:13-21.) After plaintiff was inside, Pamela Canfield, an ER registration clerk, asked plaintiff to sign a form giving defendant permission to treat her; plaintiff refused. (See Canfield Dep. at 9:14-15.)[8] Further, once Smith had obtained wet cloths to attempt to remove "a little bit of blood" on plaintiff's forehead, plaintiff would not allow Smith to clean her, and began yelling, "No, I'm not staying"; "You are just trying to get me to stay here"; "I want to go"; "Get me outside"; and "If you don't take me outside, I will go out myself." (See Smith Dep. at 35:15-19, 37:6-25.) When Smith advised plaintiff that she needed to stay and be evaluated by a physician and that plaintiff had previously been admitted to the hospital for a reason, plaintiff stated she did not want to stay and there was no reason for her to stay. (See id. at 35:24 - 36:5, 46:4-10.) Smith did not conduct a "triage assessment," as she "was not able to get [plaintiff's] vital signs," nor was she able "to take a stethoscope and listen to her lungs" or "to take a pen light and evaluate her pupils." (See id. at 42:21 - 43:5.) Smith did conduct, however, a mental orientation test, by propounding to plaintiff a series of questions, asking her if she knew what year it was, what her name was, where she was, who the president was, and who her primary care physician was, all of which questions plaintiff answered correctly; based on this assessment, Smith formed the opinion that plaintiff was mentally competent. (See id. at 41:18-25, 42:4-6.)

Plaintiff got up from the wheelchair, as though she was going to attempt to walk out of the ER, and stated to Smith, "If you don't take me outside, I will walk out." (See id. at 44:19; 45:6-14.) Smith, having been informed by someone in the ER that plaintiff's family was coming to the hospital, then took plaintiff outside in the wheelchair and waited beside her. (See id. at 45:13-14, 54:8-25.) When Roderick and Robert arrived, they saw plaintiff

---

[8] Excerpts from the Canfield deposition are attached as Exhibit D to the Declaration of Alan L. Martini filed July 13, 2005.

4

seated in a wheelchair, with a security guard, Smith, and defendant's head nurse, Alden Rabb, R.N. ("Rabb") standing around plaintiff.  (See Roderick Decl. ¶ 5.)  Both Roderick and Robert made comments to indicate they wanted defendant to keep plaintiff, and Rabb and Smith stated that they could not keep plaintiff.[9]  (See id. ¶¶ 6-7; Robert Decl. ¶ 4;[10] Smith Dep. at 55:8-16, 55:24 - 56:4, 57:13-16.)  After a heated discussion about whether defendant would or could keep plaintiff, Smith helped plaintiff to Robert's car, and Roderick and Robert took plaintiff home.  (See Roderick Decl. ¶¶ 7-8.)

At some point during the above-described incident in the ER on August 1, 2005, plaintiff was presented with a form titled "Leaving Hospital Against Medical Advice," indicating that plaintiff was voluntarily leaving the hospital against the advice of Dr. Andrus; the form bears the signatures of Smith and Raab as witnesses to plaintiff's refusal to sign the form.  (See Lovejoy Decl. Ex. B.)  Thereafter, Dr. Andrus wrote a report titled "Discharge Summary," in which he noted: "Patient left hospital against medical advice 8/1/03."  (See id. Ex. A, 14th unnumbered page.)[11]

Late in the evening of August 2, 2003, while plaintiff was at home, plaintiff's daughter called Roderick to advise him that "something else had happened" to plaintiff.  (See Roderick Decl. ¶ 6.)  At 1:30 a.m. on August 3, 2003, plaintiff was readmitted to defendant hospital, where it was determined plaintiff had suffered a second stroke.  (See id.)

**LEGAL STANDARD**

Rule 56 provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

---

[9] The parties dispute the exact request made by Roderick and Robert and dispute the reason or reasons Rabb and Smith gave to Roderick and Robert as to why defendant could not keep plaintiff.

[10] The declaration of Robert Cavender is attached as Exhibit A to plaintiff's opposition to defendant's motion and as Exhibit A to plaintiff's motion.

[11] Dr. Andrus was not present in the ER during the above-described events.  (See Andrus Dep. at 39:14-15.)

5

1 is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c).

2  The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" See Celotex, 477 U.S. at 324 (quoting Rule 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). When determining whether there is a genuine issue for trial, "'inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" See Matsushita, 475 U.S. at 587 (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

**DISCUSSION**

In her complaint, plaintiff brings a federal claim against defendant under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 13955d, as well as state law claims.

**A. EMTALA**

"42 U.S.C. § 1395dd(a) provides that if any individual comes to the emergency department of a hospital which participates in Medicare, and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital 'must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists.'" Eberhardt v. City of Los Angeles, 62 F. 3d 1253, 1255-56 (9th Cir. 1995) (quoting § 1395dd(a); alterations in original). "If the hospital determines that the

individual has an emergency medical condition, the hospital must provide either [:] '(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with subsection (c) of [§ 1395dd(b)].'" Id. (quoting § 1395dd(b)).

Here, plaintiff's EMTALA claim is based on the theory that defendant failed to comply with its duty under § 1395dd(a) to provide an appropriate medical screening examination at the time plaintiff, having "eloped"[12] from the hospital, was returned to the hospital in the early hours of August 1, 2003.[13]  Defendant seeks summary judgment on this claim, while plaintiff seeks partial judgment, specifically, a finding that it is undisputed that defendant violated § 1395dd(a) by not providing a medical screening when so requested by plaintiff's son Roderick and ex-husband Robert.

Defendant argues that plaintiff cannot establish a violation of EMTALA because, at the time of the events giving rise to plaintiff's EMTALA claim, plaintiff was an inpatient, in that plaintiff had been admitted the previous day.  Defendant further argues that, irrespective of plaintiff's status as a patient, plaintiff had repeatedly refused to be screened and treated in the ER, thereby relieving defendant of any duty to provide any services required under EMTALA.

As the Ninth Circuit has explained, EMTALA "was not enacted to establish a federal medical malpractice cause of action nor to establish a national standard of care." See Bryant v. Adventist Health System/West, 289 F. 3d 1162, 1166 (9th Cir. 2002).  Rather, EMTALA was enacted because "Congress was concerned that hospitals were 'dumping' patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." See id. (internal

---

[12]Both parties use this term to describe plaintiff's secretive departure from the hospital.

[13]Plaintiff's EMTALA claim is not based on plaintiff's presentation at the ER on July 30, 2003.  (See Pl.'s Mem., filed July 29, 2005, at 2:5-24.)

quotation and citation omitted). Accordingly, "EMTALA's stabilization requirement ends when an individual is admitted for inpatient care. . . . After an individual is admitted for inpatient care, state tort law provides a remedy for negligent care." See id. at 1169. If this were not so, EMTALA would become a "federal malpractice statute, something it was never intended to do." See id. (internal quotation and citation omitted). Further, if a plaintiff has, in fact, refused to submit to a medical screening, such party would be estopped from later seeking relief based on the defendant's failure to perform the very act the plaintiff had prevented. See, e.g., Steam Press Holdings, Inc. v. Hawaii Teamsters and Allied Workers Union, Local 996, 302 F. 3d 998, 1011 (9th Cir. 2002) (holding plaintiff estopped from alleging claim for breach of contract, because plaintiff, prior to filing suit, had repudiated contract). As a consequence, plaintiff, in order to avoid summary judgment, must submit evidence sufficient to establish that she was no longer an inpatient when she was returned to defendant's hospital during the early morning hours of August 1, 2003, and, further, that defendant was required by EMTALA to perform a medical screening examination of plaintiff despite her repeated refusal to consent to such.

Plaintiff's theory is that plaintiff, upon her elopement from the hospital, was no longer an inpatient, and that thereafter, when she was returned to the ER following her elopement, she was not competent to refuse a screening examination, thus obligating defendant to provide services against plaintiff's will, and, in particular, at the point when plaintiff's family requested treatment. For the reasons expressed below, these theories are, under the rather unusual circumstances presented,[14] untenable.

First, as to the issue of discharge, there is no dispute that defendant, at all times up to the point plaintiff left the hospital with her son and ex-husband, considered plaintiff to be

---

[14] In a typical EMTALA case involving a failure to provide a medical screening examination, the plaintiff voluntarily presents himself or herself, or is voluntarily presented by others, and an examination and/or treatment is requested but not provided. See, e.g., Stevison v. Enid Health Systems, Inc., 920 F. 2d 710, 712 (10th Cir. 1990). Here, by contrast, plaintiff was taken to the ER against her express wishes and only as a result of her having been tricked into entering a vehicle operated by one of defendant's staff, that staff member having used a well-intentioned ruse, or, in their words, a "lie", in an effort to ensure plaintiff's continued care. (See Williams Dep. at 22:1-8.)

8

an inpatient. Plaintiff asserts that irrespective of defendant's understanding, when plaintiff eloped from the hospital, she no longer was an inpatient and, as a consequence, when she was returned to the ER she was, in effect, a newly-presenting patient to whom defendant, again, owed the duties set forth in EMTALA. Plaintiff, however, offers no authority for her argument that she ceased to be an inpatient when she secretly left the hospital. In the absence of any such authority, defendant is entitled to summary judgment on plaintiff's EMTALA claim, because a hospital's failure to treat an inpatient is actionable, if at all, only under state law. See Bryant, 289 F. 3d at 1169.

Even assuming arguendo, a patient's unilateral act of elopement can constitute a "discharge" for purposes of EMTALA, plaintiff's claim nonetheless fails. Plaintiff's entire theory as to why defendant is liable for any failure to perform an examination after plaintiff's return in the early hours of August 1, 2003, despite her repeated refusal to submit to such examination, is that plaintiff was not competent to refuse treatment. In support thereof, plaintiff relies on plaintiff's behavior, specifically, that she "walk[ed] away from the hospital in the dead of the night, without telling anyone or notifying her family." (See Pl.'s Opp., filed July 12, 2005, at 10:27 - 11:2.) Additionally, plaintiff relies on the opinion of her expert, P. John Simic, M.D. ("Dr. Simic"), who opines that plaintiff, as a result of a "variety of acute and chronic illnesses," was "not of sound mind and lacked the mental capacity at the times in question," as evidenced by plaintiff's having placed herself in "peril." (See Simic Decl. D.2.)[15] Plaintiff offers no expert or other evidence from which a trier of fact could find plaintiff's status as to competency at the time of her elopement differed from her status at the time of her return.[16] Consequently, if plaintiff ultimately proves, as she must, that plaintiff was not competent to refuse treatment at the time of her return, plaintiff also will

---

[15] The declaration of Dr. Simic is attached as Exhibit C to plaintiff's opposition to defendant's motion and as Exhibit C to plaintiff's motion.

[16] Indeed, plaintiff does not argue she was competent to refuse medical care by leaving the hospital and thereafter became incompetent. In particular, plaintiff offers no evidence, nor even argues, that the relatively minor injury plaintiff sustained during the course of her elopement caused her, in the first instance, to become incompetent.

9

have proved that she was not competent to "discharge" herself by eloping. This, in turn, would require a finding that plaintiff, at the time she was returned to the ER, remained an inpatient,[17] and, again, defendant would be entitled to summary judgment on plaintiff's EMTALA claim. See Bryant, 289 F. 3d at 1169. In short, there is no evidence from which a trier of fact could find plaintiff was "dumped."[18] See id. at 1166.

Accordingly, defendant is entitled to summary judgment on plaintiff's EMTALA claim, plaintiff having failed to offer evidence to show the existence of a triable issue of fact as to whether defendant violated EMTALA.

**B. State Law Claims**

The Court's jurisdiction over the instant action is based on the existence of a federal question. Plaintiff's claims other than her claim under EMTALA arise under state law, and, thus, the Court's jurisdiction over such claims is supplemental in nature. See 28 U.S.C. § 1367(a).

A district court may decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." See 28 U.S.C. § 1367(c)(3). Where a district court has granted summary judgment on the sole federal claim, the district court, pursuant to § 1367(c)(3), may properly decline to exercise supplemental jurisdiction over remaining state law claims. See Bryant, 289 F. 3d at 1169.

Additionally, a district court may decline to exercise supplemental jurisdiction over a claim that "raises a novel or complex issue of State law." See 28 U.S.C. § 1367(c)(1). Here, plaintiff alleges that defendant violated a state statute setting forth a hospital's duties with respect to the provision of emergency care, specifically, § 1317(a) of the California

---

[17]Of course, if a trier of fact found plaintiff to be competent at the time she was returned to the hospital, defendant, given plaintiff's refusal to allow herself to be examined, had no obligation to plaintiff under EMTALA and, indeed, would be subjecting itself to liability under state law if it proceeded against plaintiff's express wishes. See, e.g., Tinius v. Carroll County Sheriff Dep't, 321 F. Supp. 1064, 1087-88 (N.D. Iowa 2004).

[18]In light of this finding, the Court does not consider defendant's argument that plaintiff cannot establish she "suffered personal harm as a direct result" of any violation of EMTALA. See 42 U.S.C. § 1395dd(c)(2)(A).

Health & Safety Code. Neither party, however, addresses, let alone submits any authority, as to whether a hospital owes the duties set forth in § 1317(a) once an individual has been admitted as a patient, and the Court has located no such authority. Consequently, it would appear that plaintiff's claim under § 1317(a) may raise a novel issue of California law.

Further, a district court may decline to exercise supplemental jurisdiction over a claim that "substantially predominates over the claim or claims over which the district court has original jurisdiction." See 28 U.S.C. § 1367(c)(2). Here, plaintiff alleges a claim of negligence, which claim is predicated, according to plaintiff's motion, on the entire course of treatment plaintiff received following her July 31, 2003 admission. Plaintiff's EMTALA claim, by contrast, is based exclusively on events that occurred in the early hours of August 1, 2003. Consequently, it would appear that plaintiff's negligence claim, being significantly broader in scope than her EMTALA claim, substantially predominates over plaintiff's EMTALA claim.

Accordingly, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over plaintiff's state law claims.

## CONCLUSION

For the reasons stated above:

1. Defendant's motion for summary judgment is hereby GRANTED on plaintiff's EMTALA claim, and is DENIED without prejudice with respect to plaintiff's state law claims.

2. Plaintiff's motion for partial judgment is hereby DENIED.

3. Plaintiff's state law claims are hereby DISMISSED without prejudice to refiling in state court.

**IT IS SO ORDERED.**

Dated: September 6, 2005

MAXINE M. CHESNEY
United States District Judge

11